# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**FILED**

JUN 3 0 2008

MAGISTRATE JUDGE SUSAN E. COX
UNITED STATES DISTRICT COURT

UNITED STATES OF AMERICA

v

ROBERTO SANCHEZ,
RAUL GALLEGOS ROJAS,
MARIO DIAZ and
JAVIER CHAVEZ

CRIMINAL COMPLAINT

CASE NUMBER:

# 08 CR 521

## MAGISTRATE JUDGE COX

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

From in or about September 2007 until on or about June 28, 2008 in Cook County, in the Northern District of Illinois, and elsewhere, defendants did

conspire and agree with each other, knowingly and intentionally to distribute and to possess with intent to distribute a controlled substance, namely, at least 5 kilogram of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title __21__ United States Code, Section _846_____. I further state that I am a

<u>Special Agent for Federal Bureau of Investigation</u> and that this complaint is based on the following facts:
Official Title

Please see attached affidavit.

Continued on the attached sheet and made a part hereof:  _x_ Yes  __No

Signature of Complainant

**FILED**

JUN 3 0 2008 TC

Sworn to before me and subscribed in my presence,

__June 30, 2008_____  at  __Chicago, IL_____  4:3 PM
Date                                                City and State

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

__Susan E. Cox,  Magistrate Judge__
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

COUNTY OF COOK            )
                         )    SS
STATE OF ILLINOIS         )

### AFFIDAVIT

I, DAVID W. OSTROW, being duly sworn, state:

1.    I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), United States Department of Justice, Chicago Field Division.  I have been so employed by the FBI for over one year.  Since becoming a Special Agent with the FBI, my duties have included investigating criminal violations of federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841(a)(1), 843(b) and 846.  In addition, I have been involved in various types of electronic surveillance (including the interception of wire communications) and the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances.  Prior to becoming an FBI Special Agent, I served as a Border Patrol Agent for approximately four years.  Through my training, education and experience, I have become familiar with the manner in which illegal narcotics are transported, stored, and distributed and the methods of payment for those narcotics.

2.    I have participated in the investigation of the individuals identified below.  Also participating in the investigation have been agents of the FBI in Los Angeles, the Drug Enforcement Administration (DEA), agents of the Internal Revenue Service (IRS), and officers and detectives of the Cook County Sheriff's Office (CCSO).  This investigation focuses on the persons identified below and others, who are engaged in a conspiracy to traffic in cocaine and use communication facilities to facilitate the commission of the conspiracy.

3.    The information contained in this Affidavit is based upon multiple sources.  The

1

investigation included surveillance on various occasions, conversations recorded pursuant to court-authorized wire interceptions (Title III's), consensually recorded conversations, interviews of other law enforcement officers and/or reviews of their reports, and interviews with the conspirators. This Affidavit is being submitted for the limited purpose of establishing probable cause to arrest the individuals identified below. Accordingly, I have not included each and every fact known to me concerning this investigation.

4.      This Affidavit has been prepared to describe facts supporting findings of probable cause that the following persons have been and are violating Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2, by conspiring to possess with intent to distribute and distributing controlled substances, namely in excess of five kilograms of mixtures and substances containing cocaine, and aiding and abetting said conspiracy during the period of September 2007 to June 28, 2008:

    (1)    ROBERTO SANCHEZ (aka BETO) ("SANCHEZ")

    (2)    RAUL GALLEGOS ROJAS (aka UNCLE) ("ROJAS")

    (3)    MARIO DIAZ (aka FRED, FREDDY) ("DIAZ"); and

    (4)    JAVIER CHAVEZ (aka CABEZON) ("CHAVEZ")

I.    **BACKGROUND OF THE INVESTIGATION**

    A.    **Confidential Witness (CW)**

    5.      This investigation was initiated based on information from a CW who identified Co-Conspirator A (Co-Conspirator A) as a cocaine supplier in the Chicago area. The CW is a confidential source of information who provided information to special agents of the Chicago

Division of the DEA and FBI from approximately August through October 2007. Previously, this CW was working with Berwyn and Cicero Police Departments (hereinafter "BCPD") for approximately a year. The CW has been arrested six times (one for Damage to property, one for Disturbing the Public Peace, and four times for Possession of Drugs) from 1993 through 2007 with two convictions.[1]  In 1993, the CW was arrested for possession of a controlled substance. The disposition for this charge is listed as guilty with a sentence of six months of probation. In 1999, the CW was arrested for possession of a controlled substance and sentenced to probation. The CW was stopped by Cicero police in April 2006 and found to have approximately one ounce of cocaine in his/her possession. Charges against the CW were not filed at that time, and the CW has been cooperating with law enforcement in the hopes of receiving charging and/or sentencing consideration regarding his/her arrest. To date, the CW has also provided information regarding several other subjects not related to this investigation. The information provided by the CW has been independently corroborated through consensual telephonic recordings, body recordings, telephone usage data, surveillance, and  pen register date. The CW has been paid approximately $500 for information the CW has provided in this investigation. The CW has agreed to testify in this and other matters.

6.      The CW has provided reliable information in separate local investigations that has resulted in the arrest of an individual for a drug charge. The information provided by CW concerning Co-Conspirator A has been confirmed by surveillance, drug purchases and drug seizures.  CW

---

[1] The following criminal history of the CW is based on a review of records from the National Crime Information Center (NCIC).

provided the following information to agents: (a) CW first became acquainted with Co-Conspirator A in 2000; (b) based upon his/her conversations with Co-Conspirator A, CW believed that Co-Conspirator A was distributing approximately 1 to 2 kilograms of cocaine a week in the Berwyn and Cicero area; (c) from 2000 to 2006, CW purchased one to two ounces of cocaine from Co-Conspirator A on hundreds of occasions before CW began cooperating with law enforcement; (d) on occasions, Co-Conspirator A "fronted" cocaine (provided the drugs to CW with payment due at a later time) to CW who would return the next day with the money; (e) CW re-sold the cocaine to his/her customers, some of whom requested sufficient purity to cook cocaine into crack cocaine; and (f) Co-Conspirator A has told CW that he has multiple suppliers for cocaine.

**B.      Title III Interception**

7.      On October 29, 2007, Chief Judge James F. Holderman (hereinafter "Chief Judge Holderman") of the Northern District of Illinois signed an order authorizing the interception of wire communications to and from (708) 698-6257 (**Target Phone 1**) for a period of thirty days. This phone was utilized by Co-Conspirator A. The interceptions pursuant to this order occurred between October 30, 2007 and November 28, 2007. The interceptions and surveillance established that Co-Conspirator A received cocaine from two principal suppliers, Co-Conspirators B and C (Co-Conspirator B and Co-Conspirator C). Co-Conspirator A would then sell the cocaine in smaller amounts to various customers.

8.      On December 6, 2007 and January 7, 2008, Chief Judge Holderman signed orders authorizing the interception of wire communications occurring to and from telephone bearing the number (708) 743-6978 (**Target Phone 3**) and believed to be used by Co-Conspirator B. The

interception pursuant to these orders occurred between December 7, 2007, and February 5, 2008. The interceptions and surveillance established that DIAZ was the main cocaine supplier for Co-Conspirator B and provided Co-Conspirator B with cocaine on several occasions.

9.    On January 31, 2008, and on March 5, 2008, Chief Judge Holderman signed an order authorizing the interception of wire communications occurring to and from a telephone bearing the number (773) 230-8424 **(Target Phone 5),** believed to be used by DIAZ[2]. The interception of wire communications over **Target Phone 5** began on February 4, 2008, and continued until April 3, 2008. The interceptions established that DIAZ was utilizing **Target Phone 5** to conduct drug transactions and collect drug proceeds and that SANCHEZ has supplied cocaine to DIAZ on several occasions.

10.    On April 10, 2008,  Chief Judge James F. Holderman of the Northern District of Illinois issued an order authorizing the interception of wire communications occurring to and from telephone bearing the number (630) 806-3290 **(Target Phone 9),** and used by SANCHEZ[3]. Interception of wire communications over **Target Phone 9** began on April 11, 2008 and ended on April 16, 2008.

11.    On April 30, 2008, Chief Judge James F. Holderman of the Northern District of

---

[2]Identification of DIAZ is based agents identifying DIAZ as the same person seen by agents in an Illinois driver's license photo image of DIAZ and seen on surveillance perfomred in conjuction with this investigation.  Additionally, public records indicate that DIAZ resides at 3940 W. 63rd St, Chicago, IL, where surveillance observed DIAZ on several occasions.

[3]Identification of SANCHEZ is based upon agents positively identifying a booking photograph of SANCHEZ as the person seen on surveillance performed in conjunction with this investigation. This included SANCHEZ being seen exiting a residence where a ROBERTO SANCHEZ is known to live.  Additionally, when arrested on June 28, 2008, SANCHEZ told agents his name was ROBERTO IVAN SANCHEZ.

Illinois issued an order authorizing the interception of wire communications occurring to and from a telephone bearing the number (773) 828-6457 (**Target Phone 10**), and used by SANCHEZ. Interception of wire communications over **Target Phone 10** began on April 30, 2008 and ended on May 21, 2008.  Interceptions established that SANCHEZ was using **Target Phones 9 and 10** to conduct drug transactions and arrange with CHAVEZ and ROJAS for drug shipments into the Chicago area.

12.    On June 4, 2008, Acting Chief Judge William J. Hibbler of the Northern District Illinois issued an order authorizing the interception of wire communications occurring to and from a telephone bearing the number (773) 828-6669 (**Target Phone 13**[4]), and used by ROBERTO SANCHEZ. Interception of wire communications over **Target Phone 13** began on June 4, 2008 and ended at the time of SANCHEZ's arrest on June 28, 2008.

13.    On June 23, 2008, Chief Judge James F. Holderman of the Northern District of Illinois issued an order authorizing the interception of wire communications occurring to and from a telephone bearing the number (323) 321-1127 (**Target Phone 12**[5]), and used by ROJAS[6].

[4]On May 21, 2008, agents were conducting surveillance on SANCHEZ and ROJAS at Fast Auto Repair, 4239 W. 26th St., Chicago, IL. At approximately 6:28 p.m., surveillance agents placed a call to Target Phone 13, and simultaneously observed SANCHEZ retrieving a cellular telephone, and bringing it to his ear attempting to answer a call. The call was terminated at that time.

[5]On May 21, 2008 , At approximately 6:21 p.m, while conducting surveillance at Fast Auto Repair, and observing ROJAS, surveillance agents placed a call to **Target Phone 12**, and observed ROJAS reach down to his waist, retrieve a cellular telephone, and simultaneously bring it to his ear attempting to answer the call. The call was terminated at that time.

[6]On June 25, 2008, a California Driver's License photo was obtained for a Raul GALLEGOS-ROJAS, DOB 12/11/1950, who had a listed address of 3050 Olive Street,

Interception of wire communications over **Target Phone 12** began on June 23, 2008 and ended at the time of ROJAS' arrest on June 28, 2008.

14.    During the court-authorized periods of interception described above, over 10,000 sessions were monitored and recorded, including not only conversations but also events such as wrong numbers, voicemails, and switch notifications. Few of the persons intercepted during the periods of interception were the subscribers to the telephones they used. On occasion, knowledge of the subscriber of record was helpful in determining the user of the phone. Most often, however, agents used information gleaned from surveillance, public documents, and the substance of the conversations themselves to identify the speakers.

15.    Times provided for the intercepted communications summarized below are approximate. The summaries do not include references to every topic discussed during an intercepted conversation, nor do the summaries include every statement made by a speaker about the topics discussed. Several of these conversations were in the Spanish language, and language analysts have provided draft, not final, transcripts or summaries of these conversations in English. Affiant's understanding and interpretation of these conversations is based on my knowledge of the investigation to date, the context of the conversations (both standing alone and in reference to prior and subsequent conversations, and in the context of the investigation as a whole), my training and experience, and conversations I have had with other agents and officers experienced in narcotics

---

Huntington Park, California. On June 26, 2008, after examining the photo, and based on surveillance conducted, agents confirmed that this is the individual referred to as UNCLE, who was utilizing 323-321-1127 (Target Phone 12). When arrested on June 28, 2008, ROJAS provided agents the name RAUL GALLEGOS-ROJAS.

investigations  Generally, affiant's interpretation of each conversation follows the summary of the conversation or is included in parenthesis.

## II.    SUMMARY OF PROBABLE CAUSE

16.    This investigation has revealed that SANCHEZ, ROJAS, DIAZ, CHAVEZ and others are significant participants in a drug trafficking conspiracy involving the distribution of multi-kilogram quantities of cocaine to multiple customers throughout the Chicago metropolitan area and elsewhere. Intercepted phone calls, physical surveillance, and drug seizures establish that CHAVEZ, ROJAS, and SANCHEZ arranged for the importation of cocaine into Chicago and that SANCHEZ delivered and agreed to deliver kilogram amounts of cocaine to DIAZ, who would then sell the cocaine to others and return the drug proceeds to SANCHEZ.

## III.    SUMMARY OF DEFENDANTS' ROLES IN THE CONSPIRACY

17.    The following is a brief summary of the roles each co-conspirator played in the conspiracy:

(a)    **ROBERTO SANCHEZ:**  SANCHEZ operated a cocaine distribution operation in the Chicago, Illinois, area.   During the investigation, SANCHEZ delivered cocaine and collected drug proceeds by meeting customers at residences and public places.  SANCHEZ also arranged for shipments of cocaine to be delivered to Chicago by ROJAS and CHAVEZ. During the investigation, three of SANCHEZ's cellular telephones were the subjects of court authorized wiretaps (**Target Phone 9, Target Phone 10, and Target Phone 13**). See paragraphs 18-25, 27-28, 29-31, 33, 34-42, 46-48, 51-56, 58-59.

(b)    **JAVIER CHAVEZ:**  CHAVEZ is SANCHEZ's cocaine source of supply in

8

California.  Intercepted phone calls indicate that SANCHEZ arranged with CHAVEZ for the shipment of cocaine from California to Chicago.  CHAVEZ gave cocaine to ROJAS and others for delivery to Chicago.  See paragraphs 29-31, 40-42, 44-46, 52-53, 59-61, 62-66.

(c)    **RAUL GALLEGOS ROJAS:**  ROJAS is responsible for the delivery of cocaine from California to Chicago, and delivering the drug proceeds back to California. ROJAS transported the contraband using a vehicle equipped with a hidden compartment to conceal the cocaine and money.  During the investigation, one of ROJAS's cellular telephones was the subject of a court authorized wiretap (**Target Phone 12**).  See paragraphs 27-28, 30-31, 33, 41, 43-45, 49-50, 56-61.

(d)    **MARIO DIAZ:**  DIAZ received cocaine from SANCHEZ and resold it to various customers throughout the Chicago area including Co-Conspirator B and others.  DIAZ was also responsible for collecting drug proceeds for SANCHEZ.  During the investigation, one of DIAZ's cellular telephones was the subject of a court authorized wiretap (**Target Phone 5**).  See paragraphs 18-26, 34-39, 54.

## IV.    PROBABLE CAUSE

### A. Intercepted Communications[7], Surveillance, Drug Seizures, and Interviews

#### 1. March 2, 2008: One Kilogram Cocaine Transaction between SANCHEZ and DIAZ

18.    On February 29, 2008, at approximately 6:43 p.m., DIAZ, who was using **Target Phone 5** received an incoming call from SANCHEZ who was using **Target Phone 9** (Session 1870). DIAZ stated that his "buddy" had left him "three ($3,000) right now, but on Sunday he will have for two more, for five ($5000)." SANCHEZ[8] said, "There is a kid that remodels the bathrooms (code for an individual having drugs for sale.)" DIAZ said, "Oh, yeah?" SANCHEZ said, "Yes." DIAZ said, "And how is his work (what is the quality of the drugs), or what's the deal?" SANCHEZ said, "Well it's fine, the only thing is that it kind of got moist. Where we placed it, it got moistened." DIAZ said, "Uh huh." SANCHEZ said, "But it's fine, as a sample and everything it's fine." DIAZ said, "Well let's see what we can do." SANCHEZ said, "If you think you can do it give me a call." DIAZ said, "I'll call you later to see what's up." SANCHEZ said, "Should I investigate elsewhere

---

[7]With respect to the intercepted conversations, some of which were in the Spanish Language, described below, while language translators have attempted to transcribe them accurately, to the extent quotations from these conversations are included, these are preliminary, and not final, transcriptions. Additionally, the voice identifications for the calls set out below are preliminary. In most cases, voice identifications are based on names used during the intercepted conversations, voice recognition that has been accomplished to date by law enforcement officers, historical information developed during the investigation, and/or telephone subscriber information.

[8]Based upon a review of the intercepted calls and listening to the arrest interview of SANCHEZ, the affiant believes that the person arrested is the same person who has been intercepted and identified in the affidavit as SANCHEZ.

(look for other customers to sell to)?" DIAZ said, "No." SANCHEZ said, "Alright." DIAZ said, "Okay." SANCHEZ said, "Give me a holler and let me know."

19.     On March 1, 2008, at approximately 5:04 p.m., DIAZ, who was using **Target Phone 5** placed an outgoing call and spoke to SANCHEZ, who was using **Target Phone 9** (Session 1928). DIAZ said, "You are working, or what's the deal?" SANCHEZ said, "No, I'm just here. I got out of work already." DIAZ said, "How do things look over there, good?" SANCHEZ said, "Well, we have a better truck." DIAZ said, "And what are the measurements (the cost), or what's the deal?" SANCHEZ said, "like about at 21st" ($21,000 per kilogram). DIAZ said, "Well too bad, that's how things are." SANCHEZ said, "More or less." DIAZ said, "And it's good for . . . the kitchen (the cocaine is of sufficient quality to be cooked into 'crack' cocaine)?" SANCHEZ said, "That's the top dog" (the cocaine is of good quality). SANCHEZ said, "It's better for that than, here by the other street." DIAZ said, "Well, it is fine then." DIAZ said, "Let's see what we can do" because "those dudes" (DIAZ's customers) want something that "in the kitchen." DIAZ said, "If you want give me a little while, to see if you can come by or see what's up." SANCHEZ said, "OK, that's good."

20.     On March 1, 2008, at approximately 7:06 p.m., DIAZ, who was using **Target Phone 5** placed an outgoing call and spoke to SANCHEZ, who was using **Target Phone 9** (Session 1949). DIAZ asked, "I don't know if you have time for today or tomorrow?" SANCHEZ asked, "You think it will take all day" (DIAZ asked to return with the drug proceeds within a day). DIAZ asked, "Pardon me?" SANCHEZ asked if DIAZ could "finish the bathroom by yourself" (take the entire amount of cocaine)? DIAZ said that he had already talked to his "nephew and some buddies" and if "the bathroom is fine" (if the quality of the cocaine is good), then "there is no problem."

11

SANCHEZ said, "I'll head over there in a little while." DIAZ said "Okay, that's fine."

21.     On March 2, 2008, at approximately 10:27 a.m., DIAZ, who was using **Target Phone 5** received an incoming call and spoke to SANCHEZ, who was using **Target Phone 9** (Session 1991). DIAZ said he was going home and that he had gone to see some buddies. DIAZ asked SANCHEZ if he would have the opportunity to pass by. SANCHEZ asked DIAZ when DIAZ thought he could "be finished" (completely sell all the cocaine). DIAZ said that once he saw it (the cocaine) he would tell "them (customers) yes and give them the number (a price for the drugs) and that's it." SANCHEZ agreed. DIAZ said, "In one day, or you know?" SANCHEZ said "I'm going to take a trip over there in a bit." DIAZ said, "That's fine. SANCHEZ asked when DIAZ would be home. DIAZ said he would be home in five minutes. SANCHEZ said, "Right now I'll just finish breakfast and head over there." DIAZ said, "Fine."

22.     On March 2, 2008, surveillance was conducted at 3940 West 63rd Street, Chicago, Illinois, which I know based on previous surveillance to be the residence of DIAZ. At approximately 11:25 a.m., surveillance observed a dark gray colored 1994 Nissan Sentra bearing Illinois license plate X377991 park on the north side of 63rd Street east of Pulaski Avenue. Surveillance observed SANCHEZ exit the vehicle and enter the east-side entrance of 3940 W. 63rd Street. At approximately 11:51 a.m., surveillance observed DIAZ and SANCHEZ talking outside the entrance to 3940 W. 63rd Street. At approximately 11:55 a.m., surveillance observed SANCHEZ enter the Sentra and depart the area, followed by surveillance.

23.     On March 2, 2008, at approximately 12:01 p.m., DIAZ, who was using **Target Phone 5** placed an outgoing call and spoke to SANCHEZ, who was using **Target Phone 9** (Session 2000).

DIAZ said, "I made a mistake with the little series" (DIAZ gave SANCHEZ the wrong amount of money). DIAZ said, "I have yours here. It belonged to the other guy, my nephew's friend." SANCHEZ said, "Alright. How much is it?" DIAZ said, "It was 27 ($2,700) plus two ($200) from the other one I gave you." SANCHEZ said, "So. Is there more in here?" DIAZ said, "Yes, more." SANCHEZ said, "Hmm. There is no problem, I am almost here." SANCHEZ said, "Check it out and let me know how much it is." DIAZ said, "No, I have yours right here, that's the thing, yours was in a different place and I made a mistake with the money in the series." SANCHEZ continued, "Alright. Listen Freddie." SANCHEZ said, "When I got there at your house." SANCHEZ gave a description a vehicle that matched that of the surveillance vehicle that was present at DIAZ's residence. SANCHEZ also described the agent driving that vehicle and provided the correct license plate of the surveillance vehicle. SANCHEZ said, "A little while ago, when I went out, the dude was right behind me." SANCHEZ said, "A little while ago, I went around and now I am behind him." SANCHEZ said, "Let's see if I can follow him around and see who he is." DIAZ said, "Ok. Are you going to stop by then?" SANCHEZ said, "Let's see in a little while. In case I do, I'll give you a call." SANCHEZ said he was now following the vehicle and was going to chase it.

24.    On March 2, 2008, at approximately 12:05 p.m., DIAZ, who was using **Target Phone 5** placed an outgoing call and spoke to SANCHEZ, who was using **Target Phone 9** (Session 2001). DIAZ said, "From the three, because I gave you three of his (DIAZ gave SANCHEZ money that was intended for another supplier), then there were 24 ($2400)." SANCHEZ said, "Was all of it 24 ($2400)?" DIAZ said, "Uh hmm." SANCHEZ then proceeded to describe the surveillance vehicle that SANCHEZ was following, including the license plate of the vehicle. DIAZ said, "Are you going

13

to stop by then?" SANCHEZ said, "Yeah, I'll stop by shortly and come right back." DIAZ said, "Ok." SANCHEZ's vehicle continued following the surveillance agent for approximately eight miles. Surveillance lost sight of the Sentra near Damen Avenue and 23rd Street. Surveillance was terminated at that time.

25.     On March 2, 2008, at approximately 12:36 p.m., DIAZ, who was using **Target Phone 5** received an incoming call and spoke to SANCHEZ who was using **Target Phone 9** (Session 2007). DIAZ said, "Hello?" SANCHEZ said, "Freddie!" DIAZ said, "How are you?" SANCHEZ said, "I'll be there shortly." DIAZ said, "Do you want to come inside?" SANCHEZ said, "I want to go inside to do that." DIAZ said, "Alright."

### 2. March 26, 2008: 4.5 Ounce Cocaine Seizure from DIAZ's vehicle

26.     During the course of the investigation, DIAZ had been seen on numerous occasions operating a Nissan Sentra bearing Illinois license plate 980 6398. Intercepted phone calls indicated that following the arrest of Co-Conspirator B, DIAZ had placed his cocaine into the Nissan Sentra in case the police conducted a search of his residence. At approximately 12:05 p.m. on March 26, 2008, a K9 unit performed an exterior sniff of the Nissan, which was parked on the 3900 block of 62nd Place, Chicago, IL. The K9 alerted to the presence of narcotics along the rear bumper and left rear wheel-well of the Nissan. At approximately 12:09 p.m., agents searched this vehicle and located a plastic storage container in the trunk of the Nissan that contained a Ziploc bag with a white-powdery substance. Also found in the trunk was plastic cellophane wrappings believed to be the packaging for the kilogram of cocaine delivered from SANCHEZ to DIAZ on March 2, 2008. Several pieces of mail addressed to DIAZ were also located in the trunk of the Nissan. The white

powdery substance field-tested positive for cocaine and weighed approximately 4.5 ounces.

### 3. April 13, 2008: Cocaine shipment from CHAVEZ to SANCHEZ, delivered by ROJAS.

27.    On April 11, 2008, at approximately 8:51 a.m., SANCHEZ who was using **Target Phone 9** (Session 2), received an incoming call from ROJAS, who was **Target Phone 12**. ROJAS[9] said, "We're moving along, we're about four hours to get to Denver, around there." SANCHEZ stated that ROJAS has "advanced a lot." ROJAS told SANCHEZ that he did not sleep last night and that he would possibly "get there by tomorrow (arrive in Chicago)." An examination of toll records and cell site locations for **Target Phone 12** indicated that this telephone was in California and then was used in Colorado, from April 10 to April 11, 2008.

28.    On April 12, 2008, at approximately 10:09 a.m., SANCHEZ, who was using **Target Phone 9**, placed an outgoing call and spoke to ROJAS (Session 13). ROJAS told SANCHEZ, "Hey, I was calling you, but it was busy. Passing the vultures (law enforcement), there were a lot there, there were two big vultures and I had to wait for them to leave, but I'm moving now." SANCHEZ asked, "Oh, they wanted to eat your corn?" ROJAS answered, "Yes, but it doesn't matter, I am now entering here into the N, Nebraska." SANCHEZ asked, "What did the bastards (police) tell you?" ROJAS told SANCHEZ that he "knows how the bastards are, they look for one thing or another" and that "they're just bunched up to waste my time." SANCHEZ asked, "Were there a lot of them there?" ROJAS replied, "Four of them arrived with their chicks" (police with drug sniffing

---

[9]Based upon a review of the intercepted calls and listening to the arrest interview of ROJAS, the affiant believes that the person arrested is the same person who has been intercepted and identified in the affidavit as ROJAS.

canines). ROJAS told SANCHEZ that they were "seven total." ROJAS then stated, "there was nothing lost from the crop" (nothing taken from the drug load). SANCHEZ asked, "Did the chicks do it from all sides" (did the dogs search the entire vehicle). ROJAS answered, "Yes, from all sides. They opened the front, they looked in the back, inside and out and they went in and pushed one thing or another,  just a bunch of bastards." SANCHEZ asked, "So it was more difficult this time?" ROJAS replied, "Yes, I think we were stopped because it snowed." ROJAS told SANCHEZ that the "vehicle is very dirty." SANCHEZ asked ROJAS, "Oh, so they just checked the junk, they did not take anything (drugs) from you?" ROJAS replied, "No, nothing and I went to bed for a little while and ah, I went to sleep and as they were checking me." SANCHEZ said, "Keep on eye on it, they didn't place anything, right (Law enforcement didn't put a tracking device on the vehicle)?" ROJAS answered "No, nothing, I was keeping an eye, I went in to sleep and got the suitcase, I checked everything around." SANCHEZ told ROJAS, "Anyway, when you get here, we're going to have to leave it on the street and wait for a few days (SANCHEZ will leave the vehicle in an area to see if law enforcement is conducting surveillance)." ROJAS told SANCHEZ that he was "held up for four hours total, three hours last night and one hour this morning."

29.    On April 12, 2008, at approximately 11:53 a.m., SANCHEZ using **Target Phone 9**, placed an outgoing call and spoke to CHAVEZ, who was using a telephone with the number 626-219-3979[10] (Sessions 17-23, 36, 39 PTT).[11] CHAVEZ asked, "What's happening?" SANCHEZ said,

---

[10]Based on voice comparison between this number and the user of phone (323) 200-7366, it was determined that CHAVEZ was the user of both phones.

[11]The following is a summation of Push-to-Talk ("PTT") interceptions that began in Session 17 and ended in Session 23 and was completed in session 36 and 39 between SANCHEZ

"He (ROJAS) hasn't arrived yet. He stopped somewhere because he says that last night they stopped and searched him for about three hours." CHAVEZ said, "Ah." SANCHEZ said, "Yes, he said that it was last night and early this morning they stopped him again with "the chicks (drug detecting canines) and all of that." CHAVEZ said, "Was it last night and again in the morning?" SANCHEZ said, "Yes a while ago in the morning again." CHAVEZ said, "Son of a gun!" SANCHEZ said, "He said that last night it was about three hours there. And early this morning again with those things that sniff and everything (drug detecting canines)." CHAVEZ said, "Is he is going clean over there (ROJAS is not being followed)?" SANCHEZ said, "Yes. In any case when he gets here, we are going to get rid of the junk for a day or two on the street so we can watch it and see what's going on (SANCHEZ is planning on storing the vehicle to see if anyone is watching the vehicle)." CHAVEZ said, "Alright, Alright. Is the road clean over there?" SANCHEZ said, "No, it's clean. I imagine that they are checking him because of what he has, those things we put in the rear. They see he is coming from over there, that's why they keep on stopping him but, they had never stopped him before."

30.    SANCHEZ continued that they stopped ROJAS "with four of those things that sniff" and that "four were checking him for about three hours." CHAVEZ said, "Son of bitch. That's messed up. But it is random (a random traffic stop)?" SANCHEZ said, "Yeah." CHAVEZ said, "Alright. Call me so that, you know, to keep me informed." SANCHEZ said, "In any case once it gets here we are going to leave it somewhere on the street where we could see it and we can check everything ourselves." CHAVEZ said, "Yes, that's right. That's right, do that." SANCHEZ said, "That's safer that way we don't get in a mess. In any case until he gets here I am going to have him

_____

and CHAVEZ.

17

calling me just in case (SANCHEZ will keep in contact with CHAVEZ)."

31.    CHAVEZ said, "I got disconnected with my phone." SANCHEZ said, "Yes I was talking a little while ago with (ROJAS)." CHAVEZ said, "But don't hide. Right?" SANCHEZ said, "He is around. We have to be real careful because four superman (law enforcement) were there on their toes." CHAVEZ said, "Did they take him in their cars to see if he will talk (Did law enforcement interview ROJAS)?" SANCHEZ said, "The four of them checked him up, down, front and back and around everywhere." CHAVEZ said, "There is no respect." CHAVEZ said, "Just let me know so my nerves calm down." SANCHEZ said, "We just passed a fire test with just four of the sniffers (the drug detecting canines did not locate the drugs hidden in the vehicle)." CHAVEZ asked, "Did they say anything to him?" SANCHEZ said that he would talk to ROJAS when he got there, and "once I find out, I'll let you know."

32.    On April 12, 2008, at approximately 9:29 p.m., SANCHEZ, who was using **Target Phone 9,** placed an outgoing call and spoke to ROJAS (Session 55). ROJAS said, "You were asleep?" SANCHEZ said, "No, none of that." ROJAS said, "It's about 280 (miles) to arrive over there, to the small house." SANCHEZ said, "It's done. Give me a call." ROJAS said, "Where are you right now?" SANCHEZ said, "Here, in the house." ROJAS said, "That's good" and asked if he should "give you (SANCHEZ) a shout out when I arrive even if I wake you?" SANCHEZ said, "That's fine, that's fine, give me holler, there's no problem. How did you see things?" ROJAS said, "Everything calm, calm. I stopped for an hour, to sleep for a little while and everything is calm."

33.    On April 13, 2008 at approximately 12:45 a.m. to 3:00 a.m., during a period of time when agents were not monitoring **Target Phone 9,** the pen register indicated several calls were made

between **Target Phone 9,** and **Target Phone 12**, the phone utilized by ROJAS. During that period

of time, toll records and cell site location indicate that **Target Phone 12** was in the Chicago area.

It is likely that the ROJAS arrived at that time. At this point in the investigation, agents were not

aware of SANCHEZ's identity or the location of his residence or stash house, and therefore were

unable to locate ROJAS or the vehicle containing the cocaine.

      **4. May 6, 2008: Two Kilogram Cocaine Transaction Between SANCHEZ and**

**DIAZ.**

      34.    On May 6, 2008, at approximately 8:24 p.m., SANCHEZ, using **Target Phone 10**,

made an outgoing call to DIAZ at **Subject Phone 11**[12] (Session 215-PTT) . SANCHEZ asked DIAZ

if he "checked everything out." DIAZ said he did and "it's for two (money for two kilograms)."

DIAZ asked SANCHEZ where he would like to meet. SANCHEZ and DIAZ then agreed to meet

at an unknown location. At approximately 8:53 p.m., Session 225-PTT, **Target Phone 10**, DIAZ

called SANCHEZ. SANCHEZ asked DIAZ if he drove around already (to evade surveillance).

SANCHEZ told DIAZ to "get out of your car and walk towards the lake in the alley to your right."

      **5. May 11, 2008: 1/2 Kilogram Cocaine Transaction Between SANCHEZ and**

**DIAZ**

      35.    On May 11, 2008, at approximately 5:20 p.m., an intercepted telephone call occurred

between **Subject Phone 11** used by DIAZ and **Target Phone 10** used by SANCHEZ (Session 424-

---

    [12]**Subject Phone 11** is a Boost prepaid phone believed to be used by MARIO DIAZ.
Identification of DIAZ as the user is based upon surveillance of DIAZ as well as voice
comparison between the user of **Subject Phone 11** and **Target Phone 5**. Additionally,
SANCHEZ addresses the user of **Subject Phone 11** as Freddy, a known alias for MARIO DIAZ.

PTT), wherein DIAZ was to purchase a half kilogram of cocaine from SANCHEZ. DIAZ asked SANCHEZ, "I wanted to ask you ...one of my friends wants to do a half, I don't know, can you do it?" SANCHEZ replied, "Does he have everything together?" DIAZ told SANCHEZ that his friend would have everything. SANCHEZ said, "Yes, it can be done as long as everything is complete." DIAZ said, "No problem, it's the same guy regarding the two who has another friend that wants to do something." SANCHEZ told DIAZ, "Just be careful, keep an eye because it's a bitch." DIAZ told SANCHEZ that he would call the guy back, go see him, and go from there.

36.    At approximately 6:00 p.m., Agents conducted surveillance in the area around 3012 S. Pulaski, Chicago, Illinois and in the area of 3940 W. 63rd Street, the residence of DIAZ. At approximately 6:59 p.m., intercepted phone call from **Subject Phone 11** used by DIAZ to **Target Phone 10** used by SANCHEZ (Session 436-PTT, **Target Phone 10**) wherein SANCHEZ asked DIAZ if he checked. DIAZ told SANCHEZ yes, that it was good (the money was in order). SANCHEZ told DIAZ they can see each other where they met the other day. DIAZ said, "Okay, how long?" SANCHEZ told DIAZ to give him around 30 to 35 minutes.

37.    At approximately 8:00 p.m., surveillance observed DIAZ get into a Nissan Sentra bearing Illinois license plate 980-6398 near 3940 W 63rd St., Chicago, IL. Agents then followed DIAZ to the area of 30th Street and Komensky near a school, located around the corner from 3012 S. Pulaski, the residence where SANCHEZ is believed to store his cocaine. At approximately 8:16 p.m., an intercepted phone call from **Target Phone 10** used by SANCHEZ (Session 441-PTT) to **Subject Phone 11** used by DIAZ took place wherein DIAZ told SANCHEZ that he was there. SANCHEZ told DIAZ to wait for him there. At approximately 8:23 p.m., an intercepted phone call

occurred from **Target Phone 10** used by SANCHEZ (Session 442 -PTT) to **Subject Phone 11** used by DIAZ wherein DIAZ told SANCHEZ that he was near the school and there was no parking. SANCHEZ then told DIAZ that SANCHEZ was by the alley (behind 3012 S. Pulaski).

38.    At approximately 8:54 p.m., an intercepted phone call took place from **Target Phone 10** used by SANCHEZ (Session 445-PTT) to **Subject Phone 11** used by DIAZ wherein DIAZ told SANCHEZ that he was on his way back (with the money) . SANCHEZ told DIAZ, "Go around a few times (to evade surveillance) because sometimes we don't know (if surveillance is present), so it's best to go around a few times and to check around." DIAZ agreed. SANCHEZ then told DIAZ, "Because the house is sacred (the location of the stash house has to remain secret)."

39.    On May 14, 2008, at approximately 7:46 p.m., SANCHEZ, who was using **Target Phone 10**, placed an outgoing call and spoke to MARIO DIAZ, who was using **Subject Phone 11** (Session 490-PTT). SANCHEZ asked DIAZ about DIAZ's nephew and the other dude. DIAZ said he talked to his "nephew" a little while ago and that he would give DIAZ "something tomorrow for sure" (DIAZ was collecting drug proceeds owed to SANCHEZ). SANCHEZ said, "Rush them, because I do need to go on foot in two to three days" (SANCHEZ was planning on leaving the area). DIAZ asked if SANCHEZ "is going to flee." SANCHEZ said, "Yeah." DIAZ asked, "How are the other dudes" (DIAZ was asking if the drugs have arrived yet). SANCHEZ said that "the dudes supposedly arrive on Monday or Tuesday" (the drugs will arrive on Monday or Tuesday). DIAZ asked that if SANCHEZ "is going to flee, how will we do this" (if SANCHEZ left how would DIAZ obtain the drugs for sale). SANCHEZ said "That guy that went with me (unknown person) right now to take you the girls (kilograms of cocaine), that same one, the one that is with me at all times."

21

SANCHEZ said, "It (the money) has to be all ready, it's just that I'm really short on cash. I have to give shout outs to obtain what I can right now (SANCHEZ was collecting money to transport to the CHAVEZ)." DIAZ agreed and said he would see what he can do. DIAZ asked if SANCHEZ could give DIAZ "his number in case" DIAZ "needs some (DIAZ was asking for SANCHEZ's partner's telephone number in case he has to get drugs when SANCHEZ is gone)." SANCHEZ said, "No, before I flee I will arrange everything for you, anyhow it's the same thing (before SANCHEZ left he will get drugs to DIAZ and arrange his meeting with SANCHEZ's partner in Chicago)." DIAZ said, "That's fine" and asked "if everything will be fine" with SANCHEZ's friend. SANCHEZ said "Everything will be calm, there will be no problem." DIAZ said, "That's fine."

**6. June 28, 2008: Seizure of approximately 8 kilograms of cocaine from ROJAS and subsequent arrest of ROJAS and SANCHEZ.**

40.    On June 17, 2008, at approximately 8:27 p.m., SANCHEZ using **Target Phone 13**, received an incoming call and spoke to CHAVEZ, who was using (323) 200-7366 (Session 242-243-PTT). SANCHEZ said that he was not able to call him yesterday because he was "busy doing some things." CHAVEZ told SANCHEZ, "That the guy from over there called me, but he wanted to give them (the drugs) to me very high, so I canceled those and I told him to give me a fucking lower number, they were too expensive." SANCHEZ asked, "At what street would they give them to you (What price)?" CHAVEZ replied, "Since there's none, he said he would give them to me at nine five ($19,500 per kilogram), fuck that." CHAVEZ said that he can get them and asked SANCHEZ what he thought. CHAVEZ then stated that he "wants to get them for nine" ($19,000 per kilogram). SANCHEZ told CHAVEZ, "If that's all there is, we can put it at two four ($24,000 per kilogram to

customers), at least." CHAVEZ said, "Then I'm going to tell the guy to bring them to me. They have them over there and that they're going to try somewhere else to see if they can get them cheaper. They're still over there in Guanatos (Guadalajara, Mexico)." SANCHEZ said, "What they went up over there" is what SANCHEZ is "going to raise it here (SANCHEZ will raise the price to his customers to absorb the cost he incurred from the supplier)." CHAVEZ said he was "going to tell the guy to come then," but that CHAVEZ had told "the guy no this morning." SANCHEZ said, "Go ahead and get them". CHAVEZ said that he was going to call the guy and tell him to come. CHAVEZ said that he would call SANCHEZ afterwards.

41.    On June 18, 2008, at approximately 9:15 p.m., SANCHEZ using **Target Phone 13**, made an outgoing call and spoke to CHAVEZ (Session 270-PTT). SANCHEZ asked, "What is happening?" CHAVEZ said, "Just the same thing" and told SANCHEZ, "It is almost here, it is for Friday or Saturday, I already spoke with Uncle (ROJAS)." CHAVEZ said that he had spoken "with Uncle, so he won't leave, he will wait" and that "it is for Friday or Saturday at the latest." SANCHEZ said, "It sounds a lot better." CHAVEZ said he would call SANCHEZ when "he calls back."

42.    On June 24, 2008, at approximately 3:18 p.m., SANCHEZ using **Target Phone 13**, received an incoming call and spoke to CHAVEZ, who was using 323-200-7366 (Session 342-PTT). CHAVEZ asked if he had him in mind. SANCHEZ asked why. CHAVEZ said, "I've been calling you since the other day, and nothing." SANCHEZ said, "All the phones were off, who knows what happens with the network. Noone would get connected and I got through to Uncle (ROJAS)." CHAVEZ said, "It doesn't matter we need to get it going, if you don't go, I will try to do it myself, taking it up there." CHAVEZ said, "We're waiting for one and if this guy doesn't bring it, it is

coming, it is ready. I already talked to Uncle (ROJAS), I told him I am waiting for this one, and it is for sure tomorrow morning, we're waiting for it." SANCHEZ agreed saying "with the other one yes." CHAVEZ said "Okay call me." SANCHEZ said "Okay, I'll call you."

43.    On June 24, 2008, at approximately 6:57 p.m., ROJAS using **Target Phone 12** (Session 37-PTT), received an incoming call and spoke to SANCHEZ, who was using **Target Phone 13**. SANCHEZ said he was busy and left it charging (the phone)." ROJAS said, "It's all set" and he "is leaving very early tomorrow morning." SANCHEZ said, "All is set and that "the insurance has been paid." ROJAS said he's "ready and will pack." ROJAS asked, "I should go directly to the house, right?" SANCHEZ replied, "yes." They talk about the condition of the house. ROJAS told SANCHEZ that he would call him "from the road." ROJAS said depending on "how the road is" ROJAS stated that he thinks that "on Friday night or early Saturday morning (ROJAS would arrive in Chicago)."

44.    On June 25, 2008, at approximately 11:40 p.m., ROJAS using **Target Phone 12**, made an outgoing call and spoke to CHAVEZ, who was using 323-200-7366 (Session 33-PTT). CHAVEZ told ROJAS that when he is "ready, to come over." ROJAS agreed to go over there. CHAVEZ agreed. ROJAS said he was "at the cleaners" and he would go to "the house to get the truck" (vehicle with a hidden compartment to transport the kilos of cocaine) and then he "will go there." CHAVEZ agreed and asked ROJAS if he knew how to get there. ROJAS said, "yes, I'll be there." CHAVEZ agreed.

45.    On June 25, 2008, at approximately 12:43 p.m., ROJAS using **Target Phone 12**, received an incoming call and spoke to CHAVEZ, who was using 323-200-7366 (Session 35-PTT).

ROJAS told CHAVEZ that he was "getting off from the freeway" and that he "will not take too much longer."

46.    On June 25, 2008, at approximately 3:24 p.m., SANCHEZ using **Target Phone 13**, received an incoming call and spoke to CHAVEZ, who was using 323-200-7366 (Session 342-PTT). CHAVEZ told SANCHEZ, "It's done and I made Uncle sweat today (CHAVEZ gave ROJAS the cocaine)."

47.    On June 27, 2008, at approximately 10:46 a.m, SANCHEZ using **Target Phone 13** (Session 418-PTT), received an incoming call from ROJAS using **Target Phone 12**. ROJAS told SANCHEZ that he would be there early in the morning, and that everything was fine. SANCHEZ asked ROJAS about any "vultures"(law enforcement). ROJAS replied "Some, but God will help us."

48.    On June 28, 2008, at approximately 9:49 a.m., ROJAS using **Target Phone 12** (Session 119-PTT) made an outgoing call to SANCHEZ at **Target Phone 13**. SANCHEZ asked how ROJAS was doing. ROJAS replied, "A little while longer, about 150 miles left (to Chicago)."

49.    Pursuant to the court order[13] authorizing cell site pings for **Target Phone 12**, from June 26, 2008 to June 28, 2008, Sprint Nextel advised that this telephone traveled from Huntington Park, California to Interstate 80 near Princeton, Illinois. On June 28, 2008, at approximately 11:00 a.m., surveillance agents observed ROJAS, driving a Black Ford F150 pick up truck with Illinois license plate 85726N, registered to RAUL R GALLEJOS at 2531 West 46th Street, Chicago, IL, "the pick-

---

[13]On May 21, 2008, Judge Daniel J. Lowenthal of the Superior Court of Los Angeles, California, signed a court order which authorized the use of location based services, which included cell site pings, for **Target Phone 12**.

up truck") traveling eastbound on Interstate 80.  Surveillance saw, on the passenger seat of the vehicle, what appeared to be a bird cage.[14]

50.  Surveillance continually followed ROJAS into Chicago.  Surveillance saw ROJAS drive the pickup truck into the alley behind 3012 S. Pulaski, Chicago, IL, the residence previously identified as SANCHEZ's stash house. At approximately 12:50 p.m., agents approached the vehicle, identified themselves to ROJAS, and placed him under arrest.  A drug-detecting K9 unit alerted to the presence of drugs inside the pickup truck.  A subsequent search of the vehicle revealed a hidden compartment located in the transmission.  Located in the compartment were nine individually wrapped packages of suspected cocaine wrapped in cellophane and tin-foil, weighing approximately 8 kilograms. The suspected cocaine field tested positive for the properties of cocaine.

### 7.    Post Arrest Interview of SANCHEZ

51.    On June 28, 2008, at approximately 1:00 p.m., SANCHEZ was arrested.  During a search of SANCHEZ's person, agents found **Target Phone 13** in his pocket.  It was explained to SANCHEZ at that time that he was being arrested for cocaine charges. SANCHEZ was subsequently transported to the FBI Chicago Division Headquarters for processing.  At approximately 2:05 p.m., SANCHEZ was advised of his *Miranda* rights that were explained to him in the Spanish language. SANCHEZ also read a copy of his rights in the Spanish language and provided written and verbal acknowledgment that he understood and waived his rights.  SANCHEZ was interviewed by a Spanish speaking agent and provided the following information to agents:

---

[14]Previous intercepted calls indicated that ROJAS was traveling with a parrot inside of a bird cage.

a.    SANCHEZ had known his cocaine source of supply, who he only knows as CABEZON (CHAVEZ) since approximately September, 2007.  SANCHEZ was introduced to CABEZON by a third-party known only as Guma.  SANCHEZ met CABEZON in Los Angeles, CA at a restaurant and made arrangements with CABEZON to purchase approximately eight kilograms of cocaine at that time.  SANCHEZ provided the money to CABEZON, and an unknown courier delivered the cocaine to SANCHEZ and Guma.  Guma took four or five kilograms, and SANCHEZ took the rest.

b.    Since September, 2007, SANCHEZ stated he had conducted five or six cocaine transactions with CABEZON, receiving a total of approximately 40 to 50 kilograms.  CABEZON used to provide cocaine to SANCHEZ at $16,000 to $16,500 per kilogram.  Lately, due to low supply, CABEZON provided kilograms to SANCHEZ at $19,000 per kilogram.

c.    SANCHEZ stated he sold the cocaine to various customers around Chicago. SANCHEZ said that he normally charged his customers $22,000 to $23,000 per kilogram.  DIAZ, who SANCHEZ knows as FREDDY, was a regular customer.[15]  For each cocaine delivery that SANCHEZ received, he would sell two or three kilograms to DIAZ.  About three months ago, SANCHEZ provided DIAZ with five kilograms of cocaine at one time.  SANCHEZ only sold DIAZ powder cocaine, and charged around $21,000 per kilogram.  SANCHEZ estimated that he has sold twenty to twenty-five kilograms of cocaine to DIAZ from September 2007 through June 2008. Usually, SANCHEZ would front or provide DIAZ with the cocaine on credit, with payment expected after DIAZ sold it to other customers.  During the last deal, however, DIAZ provided the money up

_____

[15]Agents showed SANCHEZ a surveillance photograph of SANCHEZ taken outside of 3940 West 63rd Street, Chicago on March 2, 2008.  SANCHEZ acknowledged that he was the person depicted in the photograph. *See*, paragraphs 18-25.

front to SANCHEZ. DIAZ currently owes SANCHEZ $6,000 for a past cocaine deal.

d.   Once the cocaine shipments arrived in Chicago, SANCHEZ kept the cocaine inside the pickup truck, which he either parked on the street or in the garage behind 3012 S. Pulaski, Chicago, IL. The pick up truck was used for all the cocaine deliveries. The hidden compartment used to store the cocaine and proceeds was constructed in Mexico. The hidden compartment can hold about ten kilograms of cocaine; and

e.   SANCHEZ met ROJAS in Chicago, IL a few months ago. ROJAS was looking for work, and SANCHEZ offered him a job to deliver cocaine and money to and from California. ROJAS was paid approximately $7,000 for each trip that he made. ROJAS made approximately three trips for SANCHEZ.

### 8. Post Arrest Interview of ROJAS

52.   On June 28, 2009, ROJAS was transported in custody, to the FBI Chicago Division Headquarters, and was advised of his *Miranda* rights in Spanish both orally and in writing. ROJAS acknowledged he understood these rights, signed the rights form to acknowledge this and agreed to talk with the agents. ROJAS was interviewed by a Spanish speaking agent and stated the following:

a.   ROJAS admitted that there was approximately eight kilograms of cocaine hidden in the transmission of the pick up truck. ROJAS admitted that he had transported drugs for SANCHEZ, who he knew as BETO, three times. ROJAS said he met SANCHEZ approximately eight months ago at the Fast Auto Car Garage that SANCHEZ owns. SANCHEZ asked ROJAS to pick up vehicles for ROJAS in California that were loaded with drugs. ROJAS transported drug proceeds collected by SANCHEZ back to SANCHEZ's supplier in California. The pick up truck had a hidden

compartment in the transmission where the money and drugs would be hidden.  ROJAS was aware

that he was transporting kilograms of cocaine, but on two occasions did not know the specific

amount.

      b.     SANCHEZ's supplier in California was an individual that ROJAS only knew as

CABEZON, who would be responsible for loading the vehicle with drugs.  ROJAS described

CABEZON as an approximately 30 year old Hispanic male, approximately 6'0"tall, weighing

approximately 200-220 pounds, who has short hair and a large head, (which matches the description

of CHAVEZ) who lives with a woman with no children.  ROJAS was usually paid $7,500 for these

deliveries by SANCHEZ and CABEZON. On this last occasion, he was aware through conversations

with SANCHEZ and CABEZON that he would be transporting eight kilograms of cocaine.  When

ROJAS was in California, ROJAS was contacted by SANCHEZ via telephone, that CABEZON was

ready with the drugs.  ROJAS arranged a meeting with CABEZON over the telephone.  ROJAS

drove the load vehicle to a location determined by CABEZON, which on several occasions was

CABEZON's residence.

      c.    ROJAS was shown several pictures of 5325 Bohlig Road, Los Angeles, California, and

identified this residence as being the location that he would meet CABEZON.  On the most recent

occasion, on June 24, 2008, ROJAS had been notified by CABEZON that he could come over,

because he was ready.  ROJAS drove to 5325 Bohlig Road, met with CABEZON and pulled the the

pick up truck into the garage.  ROJAS, as was the usual practice, left the vehicle in the garage, and

left the area for approximately three hours for CABEZON to put the drugs in the vehicle.  ROJAS

returned approximately three hours later, and retrieved the pick up truck.  ROJAS then drove this

vehicle from Los Angeles, California to Chicago, Illinois, where he was arrested;

d. When shown a photograph of CHAVEZ and asked whether he knew who was shown in the photograph, ROJAS said that the person was CABEZON. He was asked, "for sure?" He said yes.

e. ROJAS identified the telephone which was in his possession, with the telephone number 323-321-1127 (**Target Phone 12**), as the phone that he utilized to contact SANCHEZ and CABEZON. ROJAS gave consent to search his telephone and indicated that the phone number for CABEZON was in the telephone. A subsequent search of the phone indicated that the UFMI 124*491*6143 was in the telephone under the listing "CABESON." This is the UFMI for 323-200-7366, the phone utilized by CHAVEZ.

### 9. Identification of CHAVEZ and Search Warrant Execution

53.    On June 26, 2008, Judge Daniel J. Lowenthal of the Superior Court of Los Angeles County, California, signed a court order which authorized the use of location based services, which included cell site pings, for 323-200-7366, the number used by CABEZON, SANCHEZ's cocaine supplier. The use of this order determined the location of this telephone was at 5325 Bohlig Road, Los Angeles California. Surveillance was conducted on this residence, and an individual later identified as JAVIER CHAVEZ was observed leaving the residence in a white Acura, bearing California license plate 4SXK406. At this time, surveillance observed the white Acura drive around the block and take a pass by the residence, as if the driver was conducting counter-surveillance driving techniques. The white Acura left the vicinity of the residence and entered the 710 freeway south bound.

54.    At approximately 10:15 AM, Sprint Nextel advised that telephone number 323-200-7366 was pinging at or near 4527 Triggs Street, Los Angeles, California. At this time, the white Acura was in the vicinity of the ping.  At approximately 10:45 AM, Sprint Nextel advised that telephone number 323-200-7366 was pinging at or near 7278 Eastern Avenue, Bell, California. At this time, the white Acura was in the vicinity of the ping. Prior to arriving to 5681 Fostoria Street, Bell, California, CHAVEZ, the driver of the white Acura, conducted counter surveillance driving techniques. CHAVEZ changed lanes frequently, made quick stops at the curb and did not take the most expeditious route of travel to this location.

55.    At approximately 11:15 AM, Sprint Nextel advised that telephone number 323-200-7366 was pinging at or near 5681 Fostoria Street, Bell, California, with a small variance. At this time, the white Acura was in the vicinity of the ping and parked at 5681 Fostoria Street.

56.    On June 28, 2009, a Judge of the Superior Court of Los Angeles County, California, signed a court order which authorized a search warrant for 5325 Bohlig Road, Los Angeles, California and 5663 Fostoria, Bell Gardens, California.  CHAVEZ was located pursuant to a GPS ping on his telephone.  When his vehicle was stopped, CHAVEZ was identified, and in the vehicle was located a cellular telephone with the number 323-200-7366, the same phone used to conduct cocaine transactions with SANCHEZ and ROJAS.  CHAVEZ indicated that he resided at 5325 Bohlig Road, Los Angeles, California, and provided agents with the keys.  A subsequent search of 5325 Bohlig Road resulted in the seizure of approximately $50,000, and several firearms were located in the residence. A search of 5663 Fosteria resulted in approximately $5,000 in US Currency being found. CHAVEZ refused to give a statement to police and requested his attorney.  CHAVEZ

is currently being held in state custody pending the issuance of a federal arrest warrant.

57.    On June 30, 2009, ROJAS identified a driver's license picture of JAVIER CHAVEZ as the individual he knew as CABEZON.

58    Based on the above facts and circumstances, I believe there is probable cause to believe that beginning in our about or about no later than September, 2007, and continuing through the June 28, 2008, defendents conspired to possess with intent to distribute and to distribute controlled substances, namely, in excess of five kilograms of mixtures and substances containing cocaine, in violation of Title 21, United States Code, Section 846.


FURTHER AFFIANT SAYETH NOT.

David W. Ostrow, Special Agent
Federal Bureau of Investigation


Signed and subscribed to before me
on this 30th day of June, 2008.

at 4:30 PM

SUSAN E. COX
U.S. Magistrate Judge

32